IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN DALE PERCELLE,<br><br>            Plaintiff,<br><br>    v.<br><br>S. PEARSON, et al.,<br><br>            Defendants. | No. C12-5343 TEH<br><br><u>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS</u> |

This matter came before the Court on October 21, 2013, on Defendants' motion to dismiss. Having considered the arguments of the parties and the papers submitted, the Court now GRANTS IN PART and DENIES IN PART Defendants' motion for the reasons set forth below.

**BACKGROUND**

Plaintiff Steven Dale Percelle ("Percelle") is a former state prisoner who was classified as a gang member while incarcerated and placed in segregated housing for approximately fourteen months. He now sues eight California Department of Corrections and Rehabilitation ("CDCR") officials pursuant to 42 U.S.C. § 1983. He alleges that his gang classification and segregated housing placement was done in violation of his due process rights, and was done in retaliation for engaging in litigation activity protected by

1

the First Amendment. The Court dismissed Percelle's original complaint on July 29, 2013, with leave to amend. Dkt. No. 54. Percelle's First Amended Complaint ("FAC") is now before the Court. The FAC alleges the following:

Percelle was incarcerated at the Correctional Training Facility ("CTF") in Soledad, California from August 20, 2003 to March 16, 2013. FAC ¶ 3. For the first seven years of his sentence, he was on "A1A" status, meaning he was not in trouble and was earning good time and work time credits. *Id.*

On May 16, 2005, Percelle filed suit in United States District Court for the Northern District of California against several doctors at CTF for allegedly negligent medical care that he had received. FAC ¶ 6. On September 23, 2009, the Court granted summary judgment in favor of the defendant doctors on Percelle's Eighth Amendment claims. *Id.*[1] On January 4, 2010, Plaintiff brought his remaining state law claims to the Superior Court of California, County of Monterey. *Id.* Percelle claims that he properly served CDCR, a defendant in his state court suit, and after CDCR failed to respond, he moved for an entry of default against it. *Id.*

Thereafter, on November 18, 2010, Defendants S. Pearson, M. Williams and D. Arredondo, Institutional Gang Investigators ("IGI"s) for CDCR, searched Percelle's cell, and confiscated his address book, and a photocopy he had of a prison library book authored by George Jackson. FAC ¶¶ 6,11. In two separate memoranda documenting the search, the investigators described the Jackson book as one which Black Guerilla Family ("BGF") gang members are required to read, and also stated that Plaintiff's address book contained the names and inmate numbers of known BGF members. FAC, Ex. E. (Gang Activity Report, dated 02/19/13); FAC, Ex. I (Confidential Information Disclosure Form, dated 10/25/11).

---

[1] Although Percelle alleges that the "[C]ourt advised [him] to take his state law claims to state court," *id.*, the order merely dismissed his state law claims without prejudice. Order Granting Plaintiff's Motion for Summary Judgment at 12, Percelle v. Rosenthal, et al., No. 05-cv-1998-WHA (N.D. Cal.), ECF No. 104.

2

In early 2011, Percelle required expert testimony on damages to pursue the entry of default against CDCR. FAC ¶ 18. The court appointed a damages expert, Robert Rehm, who requested Percelle's records from CDCR. FAC ¶ 19. Percelle alleges that CDCR discouraged Rehm from examining Percelle and Rehm withdrew as an expert. FAC ¶ 21. Then, on August 27, 2011, Defendants S. Pearson and D. Fletcher, IGIs, prepared a memorandum describing Percelle as a gang member. FAC ¶ 22.

On August 30, 2011, the Superior Court appointed a new damages expert, Scott Simon, who wrote letters to CDCR and CTF requesting Percelle's records and requesting to interview him. FAC ¶ 24. Thereafter, on December 15, 2011, Defendants J. Jefferson and M. Brode, CDCR investigators, "validated" Percelle as a member of the BGF prison gang and on January 23, 2012, Percelle was placed in administrative segregation housing ("ad-seg"). FAC ¶¶ 2, 28, 30.

On January 26, 2012, CTF's Institutional Classification Committee ("ICC"), comprised of Defendants R. White and S. Maughmer, met to review Percelle's gang validation. FAC ¶ 34. During this review, Percelle alleges that Defendants refused to follow the safeguards designed to protect his rights. *Id.* He was "not allowed to see evidence, call witnesses, ask witnesses, or raise, state, explain or present evidence of the retaliatory nature of the alleged investigation and/or purported validation." FAC ¶ 48. Percelle was thereafter deemed a gang member and his ad-seg placement continued up until his release on March 16, 2013.[2] FAC ¶¶ 35-36.

Percelle alleges that ad-seg deprived him of normal human interaction and he was subsequently diagnosed with anxiety and depression. FAC ¶¶ 39, 41. Because he could no longer earn good time and work credits while in ad-seg, he was also incarcerated for a longer period of time. FAC ¶ 47.

---

[2] Defendants' counsel explained at argument that gang validated inmates are usually held in a Segregated Housing Unit ("SHU"). CTF does not have a SHU facility, so Percelle continued in his ad-seg placement pending transfer to Corcoran State Prison, which has a SHU facility. The transfer never occurred.

3

Based on the above, Percelle claims that he was deprived of a liberty interest without due process, and that he was retaliated against for engaging in protected First Amendment activity. Defendants move to dismiss Percelle's complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).[3]

**LEGAL STANDARD**

When a plaintiff's allegations fail "to state a claim upon which relief can be granted," dismissal is appropriate under Rule 12(b)(6). Fed. R. Civ. P. 12(b)(6). In ruling on a motion to dismiss, a court must "accept as true all well-pleaded factual allegations in the complaint" and construe the complaint "in the light most favorable to the plaintiff[]." *Schlegel v. Wells Fargo Bank NA*, 720 F. 3d 1204, 1207 (9th Cir. 2013) (quotation marks omitted).

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**DISCUSSION**

In their papers, Defendants argued that because Percelle's suit calls into question the length of his sentence, *Heck v. Humphrey*, 512 U.S. 477 (1994), requires him to pursue

---

[3] Defendants offer several exhibits with their motion which they request the Court take judicial notice of. Exhibits 1-3 are records from Percelle's state court filing, Exhibit 4 is a copy of Percelle's earlier filed exhibits in support of his Opposition to Defendants' Request to Waive Reply to Plaintiff's [Original] Complaint, at Dkt. No. 21. Percelle, along with his opposition brief, also submits several exhibits which he urges the Court to consider. As this is a motion to dismiss, not a motion for summary judgment, and the parties have not had the benefit of full discovery, the Court declines to consider these exhibits. *See United States v. Corinthian Colls.*, 655 F.3d 984, 998-99 (9th Cir. 2011) (internal quotation marks and citation omitted) ("As a general rule, [a court] may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion."). The following analysis is based on only on the FAC and attachments to it.

4

1    relief via habeas corpus and bars him from bringing suit under 42 U.S.C. § 1983.  At the
2    November 4, 2013 hearing, however, counsel for Defendants withdrew the argument,
3    acknowledging that *Heck*'s bar does not apply to persons no longer incarcerated, like
4    Percelle.  *See Nonnette v. Small*, 316 F.3d 872, 874-77, 878 n.7 (9th Cir. 2002) (holding
5    that when a plaintiff is no longer incarcerated, he no longer has the ability to file a habeas
6    corpus, so *Heck*'s bar does not apply).  Because the argument was withdrawn, the Court
7    refrains from further discussion of *Heck* and instead turns to Defendants' challenges to the
8    sufficiency of Percelle's due process and retaliation claims.

### I.  Due Process Claim

The Due Process Clause of the Fourteenth Amendment protects individuals against governmental deprivations of "life, liberty or property," and when such interests are implicated, it establishes that "the right to some kind of [process] is paramount."  *Bd. of Regents v. Roth*, 408 U.S. 564, 570-71 (1972).  Defendants challenge Percelle's due process claim on the grounds that there is no cognizable liberty interest in a prisoner's freedom from segregated housing; and even if there were, Percelle was afforded sufficient process before entering segregated housing.

### A.  Cognizable Liberty Interest

"A liberty interest may arise from the Constitution itself . . . or it may arise from an expectation or interest created by state laws or policies."  *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citations omitted).  The Constitution itself does not give rise to a liberty interest in avoiding transfers to more adverse conditions of confinement.  *Id*. at 221.  For state law to establish a liberty interest in the prison context, the Supreme Court explained in *Sandin v. Conner*, 515 U.S. 472, 477-87 (1995): (1) state statutes or regulations must narrowly restrict the power of prison officials to impose the condition; and (2) the liberty in question must be one of "real substance."

Here, the first *Sandin* prong is satisfied because California Code of Regulations, Title 15, Section 3339 requires prisoners to be released from segregated housing at the

5

1 earliest time practicable, and thereby narrowly restricts the imposition of segregated
2 housing. *See Toussaint v. McCarthy*, 801 F.2d 1080, 1098 (9th Cir. 1986), *overruled in*
3 *part on other grounds*, *Sandin*, 515 U.S. 472; *see also Chiaia v. Metcalfe*, No. 09-1142
4 SBA PR, 2012 WL 1094424, at *2 (N.D. Cal. Mar. 30, 2012) (concluding that *Toussaint*'s
5 holding satisfies the first *Sandin* prong). Regarding the second *Sandin* prong – whether the
6 liberty is of "real substance" – the deprivation of the liberty must "impose[] atypical and
7 significant hardship on the inmate in relation to the ordinary incidents of prison life."
8 *Sandin*, 515 U.S. at 484. For example, in *Austin*, the Supreme Court found that the
9 following conditions of confinement in an Ohio supermax prison were an "atypical and
10 significant hardship" and thereby satisfied the second *Sandin* prong:

> [A]lmost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; exercise is for 1 hour per day, but only in a small indoor room. Save perhaps for the especially severe limitations on all human contact, these conditions likely would apply to most solitary confinement facilities, but here there are two added components. First is the duration . . . placement at OSP is indefinite and, after an initial 30-day review, is reviewed just annually. Second is that placement disqualifies an otherwise eligible inmate for parole consideration.

545 U.S. at 223-24.

19       Percelle alleges that he was placed in isolation in a 6' x 11' cell with no outside
20 window. FAC ¶ 38. Three of the cell walls were concrete, the fourth was steel bars with a
21 view of a wall behind it. *Id.* Percelle's sole clothing was underwear. *Id.* He was
22 permitted time outside his cell for one hour, three days per week, however, this "yard
23 time" was spent in a 12' x 12' cage. *Id.* Any time out of his cell was also spent in
24 shackles and waist chains. *Id.* The cell itself was very noisy. *Id.* There were no options
25 to take classes, participate in any recreation, or engage in any human interaction. *Id.* As in
26 *Austin*, Plaintiff's placement was for an indeterminate term. After his initial review, his
27 status was only required to be reconsidered every 180 days. Cal. Code Regs., tit. 15, §
28 3341.5.

6

Comparing the conditions described by Percelle to those in *Austin,* Percelle has at least pled the imposition of an "atypical and significant hardship." *Sandin*, 515 U.S. at 484; *cf. Ashker v. Brown*, No. 09-5796 CW, 2013 WL 1435148, at *6 (N.D. Cal. Apr. 9, 2013) (acknowledging a cognizable liberty interest in freedom from Pelican Bay's SHU). While Defendants contend that ad-seg should not be conflated with Segregated Housing Unit ("SHU") placement or the supermax placement at issue in *Austin*, they offer no argument as to how the conditions Percelle alleges he was subjected to in ad-seg were meaningfully different from the conditions held to comprise an "atypical and significant hardship" in *Austin*. 545 U.S. at 223-24. The Court finds no reason to countenance the mere distinction in name between ad-seg, SHU, and supermax, and holds that there is a cognizable liberty interest in avoiding the adverse conditions as Percelle has pled them.

### B. Procedural Due Process

As to the question of whether Percelle was afforded sufficient process prior to his ad-seg placement, the extent of procedural protection required depends on the setting and the interest at stake. *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976). When the interest at stake involves a prison placement in segregated housing based on gang affiliation, due process requires that there be "some evidence" to support the decision. *Bruce v. Ylst*, 351 F.3d 1283, 1287 (9th Cir. 2003). Due process also requires that the prisoner be given notice of the charges against him; an informal non-adversary hearing within a reasonable time after the initial segregation; and an opportunity to present his views. *Toussaint*, 801 F.2d at 1100.

The "some evidence" standard is met so long as there was some evidence from which the administrative board's conclusion could have followed. *Toussaint*, 801 F.2d at 1105. Percelle claims that "[t]here was no evidence that logically supported a conclusion that . . . [he was] a BGF member." FAC ¶ 67. Percelle's own attachments to his complaint, however, show that prison officials relied on Percelle's ownership of the Jackson book – a book the officials said was read by members of the BGF, and Percelle's address book, which included the names of BGF members. FAC, Ex. E. (Gang Activity

7

1   Report, dated 02/19/13); FAC, Ex. I (Confidential Information Disclosure Form, dated
2   10/25/11). Also, a known BGF member identified Percelle as a fellow BGF member.
3   FAC, Ex. I (Confidential Information Disclosure Form, dated 10/25/11). Although
4   Percelle disputes the veracity of the evidence, "the relevant question is whether there is
5   any evidence in the record that could support the conclusion," and there is. *See Ylst*, 351
6   F.3d at 1287.

7   Regarding the notice and hearing Percelle received, he was notified that he was
8   being investigated for gang activity when his prison cell was searched and he received a
9   receipt documenting the items taken and the items returned. FAC, Ex. C and D (noting
10  that items were taken for review by "IGI," and that the book was being kept because of its
11  gang association). He received a memorandum explaining that another validated member
12  of BGF named him as a member, and that his confiscated papers contained the names and
13  inmate numbers of validated BGF members. FAC, Ex. I (Confidential Memorandum
14  noting date of disclosure of these facts to Percelle as 10/25/11). He was afforded a hearing
15  on January 26, 2012, just three days after his initial segregation. *Id.* ¶ 34. As there is no
16  allegation that Plaintiff was not present at the hearing or was in some way prevented from
17  speaking, he had an opportunity to present his views at the hearing.

18  Percelle contends that he was nevertheless deprived of due process because he was
19  "not allowed to see evidence, call witnesses, ask witnesses, or raise, state, explain or
20  present evidence of the retaliatory nature of the alleged investigation and/or purported
21  validation." FAC ¶¶ 66-67. Due process in this context, however, "does not require
22  detailed written notice of charges, representation by counsel or counsel-substitute, an
23  opportunity to present witnesses, or a written decision describing the reasons for placing
24  the prisoner in administrative segregation." *Toussaint*, 801 F.2d at 1100-01, *accord*
25  *Wilkinson v. Austin*, 545 U.S. 209, 228-29 (2005) (determining that prisoners are
26  constitutionally entitled only to informal, non-adversary procedures prior to assignment to
27  supermax facility). Although Percelle may have received only minimal procedural
28  protection prior to his ad-seg placement, such protection is all the law demands given the

8

circumstances.

In sum, while Percelle sufficiently alleges the deprivation of cognizable liberty interest, he fails to adequately plead a denial of due process. Accordingly, the Court GRANTS Defendants' motion to dismiss Plaintiff's due process cause of action. As Percelle has already had an opportunity to amend his complaint once, and has again failed to satisfactorily state a due process claim, the dismissal is with prejudice.

## II. Retaliation Claim

In the prison context, a claim of First Amendment retaliation requires an assertion that a state actor took some adverse action against an inmate because of that inmate's protected conduct; that the action chilled the inmate's exercise of his First Amendment rights; and that the action did not reasonably advance a legitimate correctional goal. *Rhodes v. Robinson*, 408 F.3d 558, 567-68 (9th Cir. 2005). Defendants specifically challenge the adequacy of Percelle's claim that Defendants' actions were taken "because of" Percelle's protected conduct.

It is the plaintiff's burden to demonstrate that the protected conduct was a "motivating" or "substantial" factor in each defendant's conduct. *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009) (internal quotation marks and citation omitted). Retaliatory motive may be shown by circumstantial evidence, such as the timing of the allegedly retaliatory act and inconsistency with previous actions, as well as direct evidence. *Ylst*, 351 F.3d at 1288-89.

To demonstrate Defendants' retaliatory motive, Percelle first puts forth the timing of Defendants' gang investigation. Percelle had been incarcerated for years without incident, and was suddenly suspected of gang activity in 2010. The first search of his cell occurred after he moved for an entry of default against CDCR. The validation occurred after the state court's expert contacted CTF to access Percelle's records and interview him. This pattern of litigation activity followed by gang investigation supports the notion that Defendants' conduct was retaliatory.

9

1 Second, Percelle offers the chronology of the gang investigation itself. Although
2 Defendants searched his cell in November 2010 and discovered allegedly incriminating
3 facts around that time, they waited until late 2011 to validate him as a gang member, and
4 did not segregate him until January 2012. While not dispositive, the timing at least
5 suggests that Defendants' actions were not motivated by legitimate gang concerns. *See*
6 *Ylst*, 351 F.3d at 1288-89.

7 In response to Percelle's allegations, Defendants maintain that they could not have
8 acted in retaliation because they did not know about Percelle's state court suit as he never
9 properly served CDCR. In fact, they argue, the entry of default occurred because CDCR
10 was never aware of the suit. Even if service was improper, however, the damages experts
11 appointed by the state court contacted CDCR and CTF to access Percelle's records and to
12 interview him. FAC, Ex. F (May 18, 2011 Letter from expert Robert Rehm to CTF
13 Litigation Coordinator Dan Pherigo), Ex. H (November 22, 2011 Letter from expert Scott
14 Simon to CTF Litigation Coordinator Dan Pherigo). CDCR and CTF could certainly have
15 learned of the suit from these letters.

16 Defendants also contend that even if CTF's Litigation Coordinator was aware of the
17 suit, Percelle has not proved that Defendants themselves were aware. As this matter comes
18 before the Court on a motion to dismiss, Percelle should not be expected, at this stage, to
19 *prove* that individual Defendants were aware of his state court lawsuit. From the facts
20 pled, including details about the chain of communication between prison officials about
21 active litigation, it is at least plausible that CTF's Litigation Coordinator communicated
22 with Defendants about Percelle's suit.

23 The Court thus holds that the FAC meets the requirements for pleading causation in
24 a retaliation claim through its allegations regarding the timing of Percelle's gang validation
25 process, the chronology of Defendants' gang investigation, and the chain of
26 communication between prison officials. Accordingly, the Court DENIES Defendants'
27 motion to dismiss Percelle's retaliation claim.
28

**CONCLUSION**

For the reasons set forth above, Defendants' motion to dismiss Percelle's due process claim is GRANTED, and the dismissal is with prejudice. Defendants' motion is DENIED, however, as to Percelle's retaliation claim.

**IT IS SO ORDERED.**

Dated: 11/19/13

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT