UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STEVEN DALE PERCELLE,

   Plaintiff,

  v.

STEVEN PEARSON, et al.,

   Defendants.

Case No. 12-cv-05343-TEH

**ORDER DENYING DEFENDANTS' POST-TRIAL MOTION FOR A NEW TRIAL, REMITTITUR, OR JUDGMENT AS A MATTER OF LAW**

   This matter came before the Court on Defendants' motion for a new trial, remittitur, or judgment as a matter of law. Pursuant to Civil Local Rule 7-1(b), the Court found oral argument unnecessary and vacated the hearing set for March 13, 2017. After carefully considering the parties' written arguments and the trial transcript in this case, the Court DENIES Defendants' motion for the reasons discussed below.

**BACKGROUND**

   As the parties are familiar with the factual background of this case, the Court provides only a brief summary of the facts. Plaintiff Steven Dale Percelle ("Percelle" or "Plaintiff") was incarcerated at the Correctional Training Facility ("CTF") in Soledad, California from June 16, 2003 to March 16, 2013. For the first eight and a half years, Plaintiff was housed in general population and was earning good time and work time credits. After receiving allegedly negligent medical care, Plaintiff filed a lawsuit against the California Department of Corrections and Rehabilitation ("CDCR") and obtained an entry of default with potential damages assessed at $500,000. Plaintiff claims that Defendants Steven Pearson, Derek Arredondo, Michael Williams and Dylan Fletcher ("Defendants"), who were correctional officers and members of the Institutional Gang Investigation task force at CTF, retaliated against him for his litigation activities by taking actions that led to his validation as a gang member and placement in administrative

segregation ("ad-seg"). Plaintiff spent the last fourteen months of his sentence in ad-seg, where he developed symptoms of anxiety, depression and post-traumatic stress disorder.

An eight-day jury trial was held starting December 6, 2016. Defendants testified at trial that the actions they took, which included searching Percelle's cell, confiscating his address book, taking a copy of a prison book, and requesting information from an officer at another prison that "would seal the deal" on Percelle's gang validation, were part of their job duties as Institutional Gang Investigators ("IGIs"). They claimed that they began investigating Percelle because of a tip that they had received about him. Plaintiff presented evidence that Defendants knew of the entry of default in his case, that they acted with a retaliatory motive and without a legitimate penological goal, and that he suffered harm.

At the close of evidence, Defendants moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). ECF No. 399. While the motion was under submission, the jury returned a verdict for Plaintiff. The jury unanimously found that all four Defendants had retaliated against Percelle in violation of the First Amendment. They awarded Percelle $335,000 in compensatory damages, and $50,000 against each Defendant in punitive damages. On December 21, 2016, the Court denied Defendants' motion for judgment as a matter of law. ECF No. 409. Judgment was entered on January 3, 2017, and Defendants filed their motion for new trial on January 31, 2017. ECF Nos. 413, 419.

**LEGAL STANDARD**
**I.     New Trial**

Federal Rule of Civil Procedure ("Rule") 59 provides that after a jury trial, "[t]he court may, on motion, grant a new trial . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . " Fed. R. Civ. Pro. 59(a). "Historically recognized grounds include, but are not limited to, claims 'that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940).

2

When the movant claims that a verdict was against the clear weight of the evidence at trial, a new trial should be granted "[i]f, having given full respect to the jury's findings, the judge . . . is left with the definite and firm conviction that a mistake has been committed." *Landes Const. Co., Inc. v. Royal Bank of Can.*, 833 F.2d 1365, 1371-72 (9th Cir. 1987) (quoting 11 C. Wright & A. Miller, Federal Practice and Procedure § 2806, at 48-49 (1973)). A "jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is possible to draw a contrary conclusion." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2007).

In making this determination, the court "must view all evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in the favor of the non-mover, and disregard all evidence favorable to the moving party that the jury is not required to believe." *Harper v. City of Los Angeles*, 533 F.3d 1020, 1021 (9th Cir. 2008) (citation omitted). "The test applied is whether the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Josephs v. Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006). A court may not order a new trial simply because were it sitting as the trier of fact it would have come to a different decision to than did the jury. *Wilhelm v. Associated Container Trans. Ltd.*, 648 F.2d 1197, 1198 (9th Cir. 1981).

## II.     Judgment as a Matter of Law

Federal Rule of Civil Procedure 50 governs motions for judgment as a matter of law. Once a party has been fully heard on an issue during a jury trial, the court may grant a motion for judgment as a matter of law against the non-moving party only if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed.R.Civ.P. 50(a); *Ritchie v. United States*, 451 F.3d 1019, 1022-23 (9th Cir. 2006). In deciding a motion under Rule 50(a), the Court once again draws all reasonable inferences in favor of the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

3

**DISCUSSION**

Defendants move alternatively for (1) a new trial, (2) remittitur on punitive damages,[1] or (3) judgment as a matter of law. The Court reviews Defendants' arguments for each remedy sought.

## I. A New Trial Is Not Warranted On The Basis That The Verdict Is Against the Clear Weight of Evidence.

Defendants contend that a new trial is needed because the clear weight of evidence established that Defendants did not validate Plaintiff and never had the authority to do so. Mot. at 3. They claim that Plaintiff's harm stems from his validation and placement in ad-seg, and thus absent authority to make the final determination on Plaintiff's validation, Defendants could not have caused the harm that Plaintiff suffered. *Id*. at 3-11.

Defendants are correct that substantial evidence was presented at trial showing that the Office of Correctional Safety ("OCS") has the ultimate authority to validate an inmate as a gang member. Tr. 724:17-24; 708:9-709:1. Former wardens, members of OCS and even Plaintiff's expert agreed that the role of IGIs, such as Defendants, is to identify inmates that need to be investigated for gang activity, gather evidence, corroborate information received, and submit a validation packet if there is enough reliable evidence that an inmate is a member of a prison gang. Tr. 708:9-709:1; 760:19-761:12. OCS then reviews the validation packet, checks whether the evidence used for validation complies with applicable rules and regulations, and formally validates the inmate. Tr. 708:11-709:18.  But what Defendants fail to acknowledge is that the jury was not tasked with deciding who within the prison administration officially validated Percelle or whether he was really a member of a prison gang. Those questions were only relevant to the extent

---

[1] Defendants ask in the title to their second section for "a new trial on damages or a remittitur on the punitive damages award," but they only dispute the amount of the punitive damages award. The Court construes the second section of Defendants' motion as challenging the jury's award of punitive damages, not the jury's award of compensatory damages.

4

1   that they related to elements of Plaintiff's First Amendment retaliation claim. The jury was
2   asked to decide whether the four IGI-defendants retaliated against Percelle and whether the
3   injuries he ultimately suffered were caused by Defendants' conduct. Jury Instructions Nos.
4   22-27 (ECF No. 408). A unanimous jury found by preponderance of the evidence that
5   Defendants had acted with a retaliatory motive and without a legitimate penological goal,
6   and that Plaintiff was entitled to damages. Verdict Form at 1-2 (ECF No. 404).

7   Defendants now argue that because OCS was responsible for approving the
8   validation packet Defendants submitted, Defendants themselves are not liable for the
9   retaliatory actions they took in investigating Percelle and recommending that he be
10  validated. Mot. at 9. The Ninth Circuit has squarely rejected this argument in the context of
11  First Amendment retaliation claims, holding that a jury may find that a defendant caused
12  plaintiff's injury if the deprivation plaintiff suffered was "a natural and proximate result"
13  of the defendant's actions and the defendant intended the result. *Austin v. Terhune*, 367
14  F.3d 1167, 1171 (9th Cir. 2004) (reversing a lower court's dismissal of a prisoner's
15  retaliation claim against a guard where the guard had filed a false report but had not
16  participated in the final decision that the prisoner be placed in ad-seg). The *Austin* court
17  held that "a jury could find that the administrative segregation 'was the natural and
18  proximate result of [a guard's] filing a false report accusing an inmate of violating prison
19  rules … [and] could also infer that [the guard] intended that result.'" *Id*.

20  The Ninth Circuit affirmed this standard in *McCollum v. California Dep't of Corr.*
21  *& Rehab.*, 647 F.3d 870, 882 (9th Cir. 2011). There, a volunteer chaplain alleged that
22  Sabrina Johnson, a prison official, retaliated against him by making a false allegation that
23  the chaplain had misrepresented himself as a paid chaplain; the allegation became the basis
24  for an investigation that resulted in the chaplain losing access to the facility for seven
25  months. *Id*. The district court granted summary judgment for Johnson because the evidence
26  did not show that Johnson was "involved in the decision to suspend [the chaplain's]
27  volunteer privileges." *Id*. The Ninth Circuit found the lower court's conclusion
28  inconsistent with case law, citing *Austin* for the proposition that "a false accusation may

constitute retaliation where deprivation of a benefit 'was the natural and proximate result of' that accusation and one can infer based on the facts alleged that the accuser 'intended that result.'" *Id*. (citing *Austin*, 367 F.3d at 1171). [2]

The question, therefore, before this Court is whether the record contains sufficient evidence from which the jury could have inferred: (a) that placement in administrative segregation was the natural and proximate result of Defendants' conduct in submitting a validation packet and accusing Percelle of being a member of a prison gang; and (b) that Defendants intended Plaintiff's validation and subsequent placement in restrictive housing. The Court finds that it does.

The jury heard substantial evidence of the actions Defendants took against Percelle and how those actions fit within the gang validation process. Officers Pearson, Arredondo and Williams conducted a search of Plaintiff's cell, confiscated an address book and a copy of a George Wallace book, sent an email directing another officer to obtain information about Percelle that would "seal the deal," prepared and submitted a gang validation packet. Tr. 182:16-23; Ex. 113. Lt Fletcher approved and signed off on the packet, affirming that the materials listed constituted source points for validation and that Plaintiff was associated with a prison gang. Tr. 561:23-562:6; 863:4-6. The jury heard evidence that, as IGIs, all four Defendants understood their roles to be to investigate gang activity, identify inmates who are gang members, and recommend that they be validated. In fact, as Defendant Pearson admitted, they colloquially referred to their work as "validating" inmates even though they knew that OCS had the final authority to validate. Tr. 422:14-19; 425: 9-14. Defendants knew that once an inmate is validated, he is

---

[2] Here even if the gang validation packet is not "false" in that it does not contain false information, the jury could still find that placement in ad-seg was a result of the retaliatory actions because the investigation itself was commenced and pursued in retaliation. Even when a prisoner "may have ended up where he belonged," a prison official "who uses a validation procedure as subterfuge to obscure retaliation 'cannot assert that [his action] served a valid penological purpose.'" *Shepard*, 840 F.3d at 692 (citing *Bruce v. Ylst*, 351 F.3d 1283, 1289 (9th Cir. 2003))

1   considered a greater threat to the institution and would have to be put in ad-seg both as
2   punishment and as a means of protecting the institution. Tr. 837:23-838:11.

3         Further, there is substantial evidence on the record that Defendants knew that the
4   validation packet they submitted to OCS would be approved and that Institutional
5   Classification Committee ("ICC") would not challenge that approval. Defendant Williams
6   testified that he had no reason to believe that OCS would reject the validation packet. Tr.
7   329:9-13. Defendant Pearson testified that OCS would only check whether the documents
8   in the packet complied on their face with relevant rules and regulations. Tr. 431:11-15.
9   Sergeant Williams admitted that he had never sent a packet to OCS that OCS did not
10  approve. Tr. 836:24-837:2. Others testified that OCS does not conduct an independent
11  investigation into whether a particular inmate is a gang member; they simply review the
12  packet.[3] Tr. 329:13-15. Further, Defendant Pearson admitted that he knew ICC "upheld all
13  validations" that OCS conducted. Tr. 431:22-432:1. Former wardens Spearman and Robert
14  White testified that for the years that they participated in ICC hearings, the committees
15  always upheld validations approved by OCS. Tr. 388:20-25; 389: 1; 463:10-25; 464:1-11.

16        Given the entirety of the trial testimony, it is possible the jury did not believe
17  Defendants when they claimed they could not be sure Percelle's validation packet they
18  submitted would be approved. Tr. 829:4-9; 836:21-837:2. Even if Defendants could not
19  have been certain that submitting a validation packet would lead to Percelle actually being
20  validated, the standard established by the Ninth Circuit does not require absolute certainty.
21  *See Arnold v. Int'l Bus. Mach. Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981) (noting that the
22  causation standard applied in Section 1983 cases "closely resembles the standard
23  'foreseeability' formulation of proximate cause"). It is enough that validation was a
24  foreseeable consequence of the Defendants' actions.[4]

---

[3] Thus, if Defendants had conducted an investigation in order to silence Plaintiff in retaliation for his lawsuit against CDCR despite knowing that he was not a gang member, but in the course of that investigation they managed to collect some evidence that meets the requirements for validation, OCS would validate the inmate and never question the validity of the investigation process.
[4] The Ninth Circuit has consistently held that "anyone who 'causes' any citizen to be

7

Defendants rely on two cases that are inapposite. In *Watson v. City of San Jose*, the Ninth Circuit affirmed a lower court's order of a new trial where a jury awarded parents and their three children $3,250,000 in damages for a warrantless removal of the children from their home even though a week after the removal a juvenile court found the removal warranted, depriving the parents of custody. 800 F.3d 1135, 1137-38 (9th Cir. 2015). The Court stressed that plaintiffs were required to prove that their injuries stemmed from the defendant-officers' failure to obtain a warrant, not from the subsequent seventeen month separation of the family ordered by the juvenile court. *Id*. at 1139. The Court relied on the Supreme Court's ruling in *Carey*: where "a deprivation is justified but procedures are deficient," a plaintiff must "convince the trier of fact that he suffered distress because of the denial of procedural due process itself," not the substantive loss. *Id*. (citing *Carey v. Piphus*, 435 U.S. 247, 263 (1978)). Even though the Ninth Circuit cited a number of decisions that expanded the causation analysis in *Carey* beyond procedural due process claims, the Court gave no indication that the *Carey* causation standard should apply to retaliation claims. *See Watson*, 800 F.3d at 1142. Considering the Ninth Circuit's causation analysis in *Austin* and *McCollum*, discussed above, this Court sees no reason to extend *Carey*'s holding to the context of First Amendment retaliation claims. *See Austin*, 367 F.3d at 1171; *McCollum*, 647 F.3d at 882. The rule established in *Carey* and reaffirmed in *Watson* simply does not apply to the facts of this case.

The second case Defendants cite for their argument that they did not cause Plaintiff's harm is *Pritikin v. Dep't of Energy*, 254 F.3d 791 (9th Cir. 2001). There, the Ninth Circuit discussed causation as a requirement for standing in a suit under the Environmental Protection Act, not under Section 1983. *Id*. at 796-98. The Court held that for a defendant to be held liable, plaintiff's injury cannot be "the result of the independent

---

subjected to a constitutional deprivation [can be] liable." *See Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978) ("The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.")

8

1  action of some third party not before the court." *Id*. at 797. Even though this statement of
2  tort law appears generally applicable, it is incomplete. As articulated in *Austin*, plaintiff's
3  injury can be attributed to defendant's retaliatory act if plaintiff can show that the
4  deprivation he suffered was the natural and proximate result of the retaliatory act. *See*
5  *Austin*, 367 F.3d at 1171. This standard could be satisfied even where an independent actor
6  approves the deprivation or completes the process put in place by the defendant's
7  retaliatory act. For instance, in *Hines v. Gomez*, the Ninth Circuit affirmed a jury verdict
8  for a prisoner on his First Amendment retaliation claim even though the retaliatory act (a
9  false rule violation report) was separated from the harm that plaintiff suffered (10 day
10 confinement in administrative segregation and loss of TV privileges) by an independent
11 review completed by an independent officer.[5] 108 F.3d 265, 269 (9th Cir. 1997). Similarly
12 here, if Defendants retaliated against Plaintiff by searching for evidence to validate him as
13 a gang member, they should be held liable for the proximate result of their retaliatory
14 actions—that Plaintiff is indeed validated and placed in administrative segregation. To
15 hold otherwise would be to absolve from responsibility any prison official who retaliates
16 against a prisoner but is not the final authority on how that prisoner ends up being
17 punished.
18     The Court finds that the jury's verdict of liability is supported by substantial
19 evidence. Defendants have not met their burden of showing that the evidence permits only
20 one reasonable conclusion that is contrary to the jury's verdict. Defendants' motion for a
21 new trial on liability is hereby DENIED.
22 //
23 //
24 //
25 //

---

[5] The Court notes that the officer who filed a retaliatory rule violation report in *Hines v. Gomez* had the same name as one of the Defendants in the present case—Steven Pearson. The Court finds this to be a troubling coincidence.

9

## II. Neither a New Trial Nor a Remittitur Is Needed to Revise the Punitive Damages Award Because the Award Is Not Constitutionally Excessive.

Defendants claim that the punitive damages award was arbitrary and constitutionally excessive.[6] They are correct that an award that is "grossly excessive" violates the Due Process Clause of the Constitution because it does not give individuals fair notice of the penalty to which their conduct may expose them. *BMW v. Gore*, 517 U.S. 559, 572 (1996). To determine the constitutionality of an award of punitive damages, a court must refer to the following three guideposts articulated by the Supreme Court:

> (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*BMW*, 517 U.S. at 574. After carefully considering each of these guideposts, the Court finds that the punitive damages awarded in this case are not constitutionally excessive.

First, in determining the reprehensibility of Defendants' actions, the Court must consider a number of factors, including whether the harm caused was physical as opposed to economic; whether the conduct demonstrated an indifference to or a reckless disregard for the health or safety of others; whether the conduct involved repeated actions or was an isolated incident; and whether the harm was the result of intentional malice, trickery, or deceit, or mere accident. *See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408,*

---

[6] Defendants reiterate their arguments that they did not cause Plaintiff's harm. Having found that the jury's verdict is supported by evidence, the Court notes that Defendants do not question that the imposition of some punitive damages is permitted in this case. Nor could they. A finding that Defendants acted with a retaliatory motive could support the additional finding that the conduct is malicious, oppressive, or in reckless disregard of Plaintiff's rights. *See Morse v. S.F. Bay Area Transit Dist. (BART)*, No. 12-cv-5289 JSC, 2014 WL 572352, at *16 (N.D. Cal. Feb. 11, 2014) (denying summary judgment as to punitive damages because where "a factual dispute exists as to whether [defendant] also acted with a retaliatory intent in arresting plaintiff, the Court cannot say that no rational jury could find that [defendant] acted with 'oppression, fraud or malice'"); *Powell v. Miles*, No. CV 03-1819-PHX-JAT, 2006 WL 2547359, at *10 (D. Ariz. Aug. 30, 2006) (where there was evidence plaintiff was placed in the SHU in retaliation for filing a grievance, there were "sufficient facts from which a reasonable jury could infer that the punitive and compensatory damages standard was met").

*419 (2003)*; *see also Cleveland v. Curry*, No. 07-CV-02809-NJV, 2014 WL 690846, at *9 (N.D. Cal. Feb. 21, 2014).

      Here, the harm Defendants caused was both physical and psychological in nature. Plaintiff was forced to spend fourteen months in administrative segregation, where his physical liberty was significantly more restricted than in the general population yard. The jury heard evidence that in ad-seg Plaintiff was housed in a cell the size of two courtroom-style attorney tables side by side, was forced to shower in a shower so small that the walls were pressing on his shoulders, and that the only "yard time" he got was in a fenced off area "like a dog kennel" that was slightly larger than his cell. Tr. 208:8-15; 215:3-7; 216:7-14. Anytime he was escorted out of the cell, he had to ask for a jumpsuit to cover his mostly naked body because he was only given underwear to wear in his cell; at times, the guards refused to give him a jumpsuit. Tr. 217:11-23. His access to the library was restricted, and while he was in the library, he was kept in a metal cage with his feet and one arm shackled at all times. Tr. 213:18-214:15; 217:24-218:8; Exs. 9,10. As a result of these conditions, he developed lasting paranoia, depression and anxiety. Tr. 220:18-21; 228:15-229:24; 606:1-5.

      Defendants' conduct was oppressive, malicious or in reckless disregard of Plaintiff's rights, as the jury unanimously found. Verdict Form at 2 (ECF No. 404). Defendants took repeated actions that cumulatively caused the harm: they searched Plaintiff's cell, confiscated his belongings, refused to provide him with the names of individuals in his address book with whom he had allegedly communicated with, failed to investigate his explanation, as they are required to, directed another officer to find information to "seal the deal" on Percelle's validation, submitted a gang validation packet to OCS. Tr. 208:23-209:13; 658:6-15; 737:17-21; Ex. 113. Lastly, the evidence shows the harm caused was more likely the result of intentional malice or callous disregard of the inmate's rights rather than mere accident.

      Defendants argue that they acted in compliance with their job duties and thus their actions were not reprehensible. Mot. at 13. Their argument is logically and ethically

11

flawed: a prison guard authorized to use force in certain circumstances may not use force to retaliate against a prisoner just because use of force is within his "job duties." The case law is clear—an otherwise permissible act may not be performed for a retaliatory reason. *See e.g., Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001) (holding that "repeated threats of transfer because of [the plaintiff's] complaints about the administration of the [prison] library" were sufficient to ground a retaliation claim). The fact that Defendants had a responsibility to investigate individuals who they had evidence to believe were members of a prison gang does not mean that their actions in investigating Percelle, which the jury found were taken in retaliation for his protected conduct, were not reprehensible. To the contrary, it is reprehensible for a prison employee to use his position of power and authority to deprive an inmate of a constitutional right and to then use the gang validation procedure as a cover for his retaliatory actions.

The second guidepost the Court considers is the disparity between the harm suffered by the Plaintiff and the punitive damages award. *See BMW*, 517 U.S. at 574. Although "there are no rigid benchmarks that a punitive damages award may not surpass," courts have generally found excessive ratios of punitive damages to compensatory damages of 145:1. *State Farm, 538 U.S.* at 425. The Supreme Court has stated that "single-digit multiplies are more likely to comport with due process." *Id.* Here, the combined punitive damages award of $200,000 comprises less than two thirds of the $335,000 awarded in compensatory damages, a much lower ratio than ratios found to be excessive. As a result, there is no major disparity between the harm suffered and punitive damages awarded in this case.

Lastly, the punitive damages award does not appear grossly excessive when compared to damages awarded in similar cases. Damages awarded range depending on the seriousness of the injuries caused by Defendants' conduct: *Smith v. City of Oakland*, 538 F. Supp. 2d 1217 (N.D. Cal. 2008), aff'd 379 Fed. Appx. 647 (9th Cir. 2009) (unlawful incarceration and eviction; economic and non-economic damages of $5,000,000 remitted to $3,000,000, punitives of $100,000); *Davis v. Rennie*, 264 F.3d 86 (1st Cir. 2001)

(mentally ill patient suffering injuries—$100,000 general damages; punitives $500,000 each of two defendants and $250,000 third defendant); *Knapp v. City of Oakland*, 647 F. Supp. 2d 1129, 1171 (N.D. Cal. 2009) (plaintiff subject to "unnecessary carotid hold" preceding a fabricated police story—$125,000 in economic and non-economic damages; punitives at $30,000 against one officer, and $20,000 against another); *Smith v. City of Oakland*, 2011 WL 5325484 (N.D. Cal. 2011) (parolees stripped searched in public, suffered humiliation and emotional pain—about $100,000 awarded in compensatory damages awarded to each plaintiff, $25,000 punitives to one plaintiff, $15,000 to another).

As stated above, Plaintiff experienced severe physical restraint and mental anguish. Contrary to Defendants' position, the facts here differ from those in *Perez v. Gates,* No. 3:13-cv-05259-CV (N.D. Cal., Filed Nov. 19, 2013). Perez was already in the SHU when the prison guards searched his cell in retaliation for the lawsuit he had filed against CDCR. *See Perez* Aug. 19, 2014 Joint Case Management Statement (ECF No. 40). He was kept in the SHU for a year following the search, not because of the retaliatory conduct, as is true here, but because it took a year for the settlement agreement in his previous case to be the finalized and for CDCR to allow him to get reevaluated under the terms of the agreement. *Id*. at 3-4. In contrast to Perez, Percelle would not have been housed in the ad-seg were it not for Defendants' retaliatory actions. The harm that Percelle suffered as a result of Defendants' conduct is greater; it is reasonable that the punitive damages he is awarded are also greater than the $5000 against a single defendant awarded to Perez.

The Court finds that the punitive damages awarded in this case are not constitutionally excessive. Defendants' motion for a new trial or remittitur on punitive damages is hereby DENIED.

### III. Defendants Are Not Entitled to Judgment as a Matter of Law.

Defendants renew their motion for judgment as a matter of law. They repeat all of the arguments raised in their original motion filed on December 19, 2016. ECF No. 399. This Court already rejected those arguments in a reasoned opinion, finding that there was a

13

legally sufficient evidentiary basis for the jury's verdict in favor of the Plaintiff and against all four Defendants. ECF No. 409.

Defendants now incorporate their causation argument from their motion for a new trial into their motion for judgment as a matter of law. Mot. at 18. As stated above, even though Defendants claimed that they did not know that their actions would result in Plaintiff's validation as a gang member, based on all of the evidence at trial, the jury could have concluded otherwise. There was sufficient evidence presented at trial from which the jury could have found that gang validation was the "natural and proximate" result of Defendants' submission of a gang validation packet and that the Defendants intended to see Plaintiff validated. *See supra* Part I.

In addition, Defendants claim that there was less evidence presented to show that Defendants Williams and Fletcher retaliated against Plaintiff. Mot. at 17-18. They dispute that a reasonable jury could have found these two officers liable. Defendants are mistaken. The record contains sufficient evidence of Williams' and Fletcher's personal participation in retaliatory conduct.

First, Defendants Williams and Fletcher took actions against Percelle that a reasonable jury could consider adverse actions. Sergeant Williams searched Percelle's cell and reviewed the validation packet prepared by Officer Pearson. Tr. 289:2-5; 424:12-425:2. Lieutenant Fletcher approved the packet. Tr. 561:23-562:6; 863:4-6. Second, the jury could have found that they acted with a retaliatory motive. There was sufficient evidence to show that both Williams and Fletcher knew of Plaintiff's litigation activities. Williams could have seen Percelle's legal papers while conducting a search of his cell. Tr. 184:21-185:6; 438:25-439:1. Fletcher could have learned about the entry of default in favor of Percelle from CTF Litigation Coordinator Dan Pherigo or from the other IGIs. In fact, the jury heard expert testimony that Fletcher, as a lieutenant, is the "true IGI" and that other IGIs worked for him. Tr. 784:6-16. Considering that Sergeant Williams "worked closely" with Officer Pearson and that Lieutenant Fletcher supervised the three other IGIs, the jury could have inferred that all four Defendants shared information about

14

Percelle's protected activity and acted in concert to silence or punish Percelle by attempting to validate him as a gang member. Tr. 424:12-425:2; 561:23-562:6; 784:6-9; 288:9-289:1.

Further, Plaintiff presented evidence that Defendants used the gang validation process as a cover for their retaliatory conduct, not for its legitimate correctional purpose. Expert witness Richard Subia testified that Defendants submitted a validation packet that did not meet the requirements of Title 15 because Defendants did not corroborate information in the debrief report, did not identify any gang-related behavior Plaintiff was involved in, and did not investigate whether Plaintiff had any communication with individuals whose names appeared in his address book. Tr. 764:15-773:14. All of the Defendants, but especially Sergeant Williams and Lieutenant Fletcher as superiors to Officers Pearson and Arredondo, were tasked with ensuring that the evidence they submit to OCS is reliable and actually indicative of gang membership. Tr. 760:19-762:23; 784:6-786:4; 562:18-563:7. The fact that they did not attempt to do so here is circumstantial evidence that Defendants used the gang validation process as a pretext. Lastly, the timing of Defendants' investigation suggests an absence of a legitimate correctional purpose—for eight and a half years Plaintiff was a model prisoner, had no chronos but one for speaking back to an officer, no reports of violent or gang-related behavior, and then a year before he was supposed to be released, Defendants decided to search his cell for gang-related materials, coincidentally soon after he had obtained an entry of default in a case against CDCR. Tr. 155:3-21; 150:19-155:2; 293:22-23; 178:12-181:16; Ex. 116.

In sum, Plaintiff presented sufficient evidence to support the jury's finding that Defendants Williams and Fletcher retaliated against him in violation of his rights under the First Amendment.

//
//
//
//

**CONCLUSION**

After reviewing the trial record and drawing all reasonable inferences in favor of the nonmoving party, the Court finds that Defendants have not met their burden of showing that the jury verdict should not stand. Defendants' motion for a new trial, remittitur, and judgment as a matter of law is hereby DENIED.

**IT IS SO ORDERED.**

Dated:  03/14/17                              _____
                                                                THELTON E. HENDERSON
                                                                United States District Judge